Good morning, Your Honors, and may it please the Court. My name is Lola Kingo, and I'm appearing on behalf of the appellant, Mr. Edward Hernandez. I'm going to try my best to reserve three minutes for rebuttal. I'd like to begin by noting that although we've briefed a number of issues in this case, for purposes of oral argument, I'd like to focus on the two claims where I think I could be most helpful to the Court. The first is with respect to Mr. Hernandez's claim raised under the Religious and Land Use Institutionalized Persons Act. And second is the claim brought – Mr. Hernandez's claim brought under the Due Process Clause. The district court held that the Arizona Department of Corrections' refusal to accommodate Mr. Hernandez's request for a sweat lodge – to participate in sweat lodge ceremonies, excuse me – was supported by competent evidence in the record. This was an error. There is no dispute that a sweat lodge ceremony is a religious exercise protected under ALUPA, and that Mr. Hernandez's beliefs about sweat lodge ceremonies are sincerely held. However, the ADOC maintains that it cannot accommodate Mr. Hernandez's request for a sweat lodge because the unit where Mr. Hernandez is confined is not designed for or capable of accommodating a shelter such as a sweat lodge, and secondly, that a sweat lodge raises a number of security concerns. The sole body of evidence that the ADOC relies on to support these conclusions is two declarations by the Pastor Linderman, who is an administrator of pastoral services. It is our position that first, Mr. Linderman's – Pastor Linderman's declarations are wholly conclusory and do not fulfill the obligations under ALUPA to properly consider the request and also consider less restrictive means of accommodating Mr. Hernandez's request. Secondly – Let me ask you this about less restrictive means and so on. I mean, as I understand the sweat lodge, it requires construction of something with poles that face at least in four directions and maybe some other poles to do the supporting. It requires hot rocks. It requires steam. In other words, it requires a fair amount of work, and it probably requires more than one person, maybe requiring even more than two. He's in solitary confinement. We can get to the question as to whether he ought to be in solitary confinement. That's another one of your claims. But assuming that he's properly in solitary confinement, I'm not sure that I need to know much more than what's just been described in terms of what's implied in a sweat lodge to say that consistent with the conditions of confinement in this special management unit, that that's a sufficient penological justification. Your Honor, the ADOC relies on the Eighth Circuit decision fowler, and in there we have declarations provided by people who are capable of speaking to security concerns that are raised by a sweat lodge. The important factors here are what the ADOC should have considered is given this particular inmate population, given the number of people who would like to participate in the sweat lodge ceremony, and a number of other factors, whether or not a sweat lodge would raise security issues. Have you put in the record how many people in this unit would like to have sweat lodge ceremonies? No, Your Honors. What we have in the record is the request from Mr. Hernandez to participate in sweat lodge ceremonies. So you're saying, well, they should have considered how many, but we don't know and you have not put it in the record. Correct. But the key here, though, would be that once Mr. Hernandez has made his request to participate in sweat lodge ceremonies, the burden under ALUPA is on the government to figure out how they could do that. Can I ask you to move off of the two that you want to talk about? I'm interested in the pipe ceremony. Apparently you can perform the smudge ceremony, although there may be some difficulty about, I'm not sure what it is, switching in and out different lighters. But the smudge ceremony apparently is permitted. The pipe ceremony, I'm a little unclear of the claim he wishes to make. Does he say he wants to perform the pipe ceremony and is unable to do so? He wants to perform the pipe ceremony with a spiritual advisor and is unable to do so. Can you clarify for me what's going on with the pipe ceremony? Sure. I want to be clear at the outset that the record on this issue is not entirely clear, and I understand that's why this issue is raised. In speaking to Mr. Hernandez, what he would like to do is perform a pipe ceremony and also perform a pipe ceremony with a spiritual advisor. However, even though the policies allow for the performance of a pipe ceremony, Mr. Hernandez has maintained that he's not allowed to, in fact, engage in a pipe ceremony in practice. So when he makes a request to perform a pipe ceremony, which requires certain accoutrements, that he doesn't receive those from the ADOC. And, of course, because he's confined in SMU 2, he can't keep things such as a pipe on him. He has to request those, and those aren't provided to him. And that's the basis of his complaint. I get you. So he's asking for two, as it were, separate things with respect to pipe ceremony. One is perform a pipe ceremony by himself, and the other one is he'd like to do it with a spiritual advisor. And he contends that neither is, in fact, allowed by the prison. Correct. And we would maintain that that would then create a genuine issue of material fact that wouldn't be appropriate for decision at summary judgment, because on the one hand the ADOC maintains that he can perform these pipe ceremonies, and on the other hand Mr. Hernandez claims that he's not able to perform the pipe ceremonies when he'd like to. Okay. I'm not sure if the Court is interested in hearing with respect to the sweat lodge ceremonies. My second point with respect to that really is that at the end of the day, even if this Court were inclined to accept Pastor Linderman's declarations regarding security, the fact of the matter is the ADOC did not fulfill its burden of considering less restrictive means. Again, the burden is on the government to go ahead and consider other alternatives in terms of accommodating Mr. Hernandez's request. Instead, Pastor Linderman simply says the notion of having a sweat lodge in SMU 2 is wholly irreconcilable with the policies of SMU 2. That's a conclusory statement. That's not an analysis of why that would be the case. Can you help us with the due process claim in terms of classification? My understanding of what's going on in this case is that because of his membership in this group, he's been classified such that he goes into SMU 2. Correct. And that he's allowed a sort of a reconsideration for reclassification only once a year. But there's something called step down or something else. Can you help me figure out how those things are or might be related? Sure thing, Judge Fletcher. The first thing I wanted to point out is the sole basis for placing Mr. Hernandez and retaining Mr. Hernandez in administrative segregation is his membership in what the ADOC has classified as a security threat group. It's our position that under the due process clause where the ADOC is required to present some evidence that Mr. Hernandez would severely endanger the lives of prisoners or the security of the institution, that his membership alone does not fulfill that requirement. The reason is because what the ADOC has done is concluded in a decision-making process that we cannot challenge under the law. That the Warrior Society, which, by the way, is a group that has Native American, that comes together in part because of shared Native American heritage and Native American religious practices, that that group presents some sort of threat to the institution. And in that, after making that determination, Mr. Hernandez admitted that, yes, he is a member of that group. But the fact that he's a member of that group doesn't mean that he ascribes to the particular things that, the particular characteristics in that group that make it a security threat group. Yes, I understand that argument. But there's something about either step-down or debriefing. The thing that troubles me, in favor of your client troubles me about what's going on here, is that as far as I can tell, he only gets a formal process of reconsideration once a year. Correct. But there's something in here about possibility of step-down programs or debriefing that might make it more frequent, and I don't understand what those two things are, step-down program or debriefing. Okay. So with respect, Mr. Fletcher, excuse me for not answering your question more clearly earlier, with respect to debriefing, that's a process where Mr. Hernandez can go and renounce his membership with the Warrior Society, provide some sort of information about other inmates in the prison. And then at that point, he would no longer be an SMU-2, but he could not be placed back in the general population, because at that point essentially he's become a jailhouse snitch and that's dangerous. So it's our position that, first of all, that's really not an alternative for Mr. Hernandez. It doesn't really resolve the issue of the frequency of the review, because essentially at that point, if the fact that he can at any point renounce his membership is the test, then why have any kind of review at all? Secondly, Mr. Hernandez does not feel comfortable renouncing, not only because of the danger that it places him in with the general prison population, but also because it would be a renouncement of his Native American beliefs. What's the step-down? With the step-down process, this is a process that first takes 24 months and then 18 months. The first 24 months requires that Mr. Hernandez is on good behavior, doesn't engage in any sort of misconduct. And then if that's shown, then the next 18 months, I have to look at the record more closely actually on this, because I know it's cited in there, then he would be eligible again to sort of get out of SMU-2. But there is no evidence in the record that that step-down process has in fact been offered to Mr. Hernandez, even though the ADOC maintains that this policy is on the books. And, in fact, the issue there really is that there's been some back and forth. The ADOC has had the step-down process at some points, and then at some points it's also not had the step-down process, which, again, creates the problem that we're in, where it's not really ---- Can he actually get back to the general population? Through the step-down process, yes, he would be put back into the general population. But the issue there, again, is, I think, first, it doesn't answer the question as to the frequency of reviews, because, again, if we're saying that the test is so long as he can let himself out, then it doesn't matter how frequent the review is. I think that would be erroneous. But, secondly, the issue with the step-down process, again, is that it's not even clear that this is a process that is in fact offered to Mr. Hernandez because the ADOC has gone back and forth in offering it. Okay. We've taken you over time, but there are enough issues in this case that we probably misallocated 10 minutes aside. So we'll hear from the State, and then we'll make sure you get a chance to respond. Thank you, Judge Fletcher. May it please the Court, my name is Michael Gottfried. I'm an Assistant Attorney General for the State of Arizona, and I'm here representing the defendants. And, Judge Fletcher, let me try to clarify the difference between the step-down process and the renunciation process. Renunciation process is, as counsel says, where the inmate who's been validated as a STG member, a prison gang member. Validated as jail speak for having been identified as? Absolutely. You guys don't speak English, but okay. That happens sometimes. That's true. Has been identified as a prison gang member. And he does. He renounces his prison gang membership. The step-down process, on the other hand. Wait a minute. And in addition, in order to qualify for this, he also has to be a snitch? No. He doesn't have to be a snitch. I think what counsel is implying is that the process of saying, I'm not a gang member anymore, may label somebody as a snitch. Why would that happen? He's no longer a gang member, and the gang thinks it's bad not to be a gang member anymore, and that you may be telling gang secrets to people. And I should note for the Court, this happens all the time in the prison. I mean, people, there's all kinds of issues, there's all kinds of situations where individuals are labeled snitches, are somehow getting on the wrong side of people, and the prison deals with that on a daily basis. Sure, sure. By placing them in different situations, in different prisons, in different parts of the state, isolating them. Right. The step-down process, on the other hand, doesn't require the prisoner to formally denounce his gang membership. What it is is a relatively long process where the prisoner has to establish that he's not a member of that gang anymore. He doesn't have to tell about the gang. He doesn't have to give information about the gang. All he has to do is indicate that he's not a member of the gang, prove he's not a member of the gang, and then there's a period of going through counseling and anger management courses and different kinds of psychological courses, and at the end of that, he's eliminated. You're confusing me because you're saying in the step-down program, he doesn't have to identify members of the gang and so on. There's negative pregnancy, and that suggests that if we're talking about the debriefing, he does have to identify other members of the gang, and you just said he doesn't. Is there any circumstance under either debriefing or step-down that he does have to identify other members of the gang? In the debriefing process, he's supposed to indicate the knowledge he has about the gang. Oh, well, then you misanswered or misunderstood my question as to debriefing. You mean, would he be automatically a snitch or not? Yes, and so if he's identifying other members of the gang, that sounds like snitching. If he knows about them. It depends on what he knows and what he doesn't know, I assume, in each individual case. Okay, but I think I now understand your answer to the first question, the debriefing, a little better than I did previously. And I apologize if I misspoke. Again, the step-down process does not involve any kind of affirmative action about the gang's activities. Is there a dispute as to whether or not, in fact, the step-down process is available to him? There shouldn't have been, Your Honor, and there's not. I didn't ask whether there should be, I asked whether there is. There's not. The step-down process periodically undergoes reviews, and it comes off the books and goes on the books. Is it currently available to him right now? It's not in the record, Your Honor. I can answer the question. Well, if it's not in the record, it's not in the record. The only thing that's in the record is that it was currently available. It was available at the time he ---- And they say it's not. They say it's not because they're citing ---- That sounds like it's disputed. Your Honor, they're citing an interrogatory answer that wasn't produced to the district court. District court rejected it when they tried to produce it later. It was around before. It was never given to the district court, and this court shouldn't be considering it. It wasn't part of the record below. And if we put to one side the debriefing and the step-down process, I think it is uncontested that the review process for whether, in fact, he's a gang member takes place once a year and not more frequently. Absolutely, Your Honor. And assuming that that's the only way, putting to one side for the moment the debriefing and the step-down, assuming that the only way he can get classified out of SMU based on gang membership is this once-a-year review process, is it your view that that only once a year complies with due process? Your Honor, I don't believe that the only way he can debrief any time he wants. I didn't ask that question. I said assuming that debriefing and step-down are not available, does it comply with due process that he gets only a once-a-year review? Assuming debriefing isn't available either? That's correct. Yes, I believe it does comply with due process. Because? Because the reason he is in there is only because he's a gang member. There's no other reason. Right. It's hard for me to answer because he can debrief at any time. Well, he can debrief, but it sounds as though the debriefing process is extraordinarily expensive to him. That is to say, it puts him in real danger. No, Your Honor. I don't believe it does, first of all. And you don't believe it is? What's in the record so that I can conclude that you're right? I think it's the question is what's in the record. A number of courts have turned around and said that, including this Court in an unpublished decision, that it's not a due process, the unpublished, Mullins v. Stewart, that renunciation and debriefing does not violate either due process or the Fifth Amendment. What it may violate conceivably, arguably, is the Eighth Amendment, because the argument is, well, if he debriefs and he's putting himself in danger by debriefing, that may be an Eighth Amendment argument. Yeah. Never raised in the lower court, never raised in these briefs. It's not an issue before this Court today. Okay. Part of my problem is that this was resolved on summary judgment, and there are a lot of questions that seem to me are a little bit at least up in the air. One thing that was not mentioned by the other side but that has bothered me a little bit, so I'll put it on the table, there's a 7-watt bulb in the cell that's illuminated all the time, and that does not appear to be challenged. Correct. There are three 40-watt bulbs in the cell, and they are illuminated much of the time. Monday through Friday, they're illuminated up until 10 o'clock at night and then put back on again at 4 in the morning. In the weekend, they're illuminated until midnight and put back on at 4 in the morning. He complains that having this level of lighting in the cell for that long a period gives him only 6 hours, Monday through Friday, of only 7 watts and only 4 hours on the weekends, and that gives him headaches, interferes with his sleep, and so on. I don't understand exactly what the justification is for the prison for having these three 40-watt light bulbs on during this period. The uncontradicted evidence in the record, Your Honor, is that any period of darkness in the prison, any period of low light even in the prison, not just darkness, is a danger, is a risk. The doors on the prison, well, I don't think it's in the record. The uncontradicted evidence in the record from the people responsible for security, not Pastor Linderman, from the people responsible for security, is any level of low light is dangerous. They can't see what's going on. I read the depositions, and when they talk about danger, they're almost always talking about periods of non-light, and they're justifying the 7 watts. I don't find much deposition or declaration evidence saying that the 120-watt, I'll just call it that, the 340-watt, it comes under the same heading. I mean, if it were true that it's that dangerous, I guess the logical conclusion is you never turn off the 120 watts. But, of course, they do. They just don't let him sleep uninterrupted for more than four or six hours, depending on what day it is. Your Honor, it's the, I believe it's in volume 2, page 26. Okay. Hang on a second. Oh, I could be wrong. I'm sorry. Volume 2 page. No, I'm sorry. That's not. The testimony was, the declaration testimony was that any level of darkness, not just of dim light, darkness is dangerous. Well, I'm looking at paragraph 12 on page 98, which probably is what you're thinking of, and this is a declaration by Carson Williams. In paragraph 12, he says, finally, even with the dim security lighting at night, inmates in the SMU-2 are still able to create weapons and other contraband in their cells, allowing the inmates to operate during several hours of complete darkness every day would severely hamper the ability of ADC to maintain a safe environment. That's a pretty conclusory statement. I don't know about evidence and so on, and it seems to me that they're allowing some hours of complete darkness, five days a week, four hours of complete darkness, or I should say it this way, the seven watts is always on. I shouldn't say complete darkness. Correct. So if he's talking about complete darkness, that's not an issue, because if he means really complete darkness, there's never complete darkness. No. So I'm not talking about the seven watts. I'm talking about the 140 watts that are illuminated most of the time. Your Honor, I think the rationale is that it would be best for the department to have the 140 watts on all the time. That's the best situation security-wise. I think that's what the sentence, the passage you just quoted means. But it's true. It's compromised by saying, you know, we have to leave some, there has to be, we're trying to accommodate sleeping patterns and giving some dim light for sleepings, but even the dim light is a danger. Yeah. But he says complete darkness. I mean, I'm having trouble with this. Do we have anything in the record as to practices in other prisons, in other states, in their high-security prisons, in terms of how they deal with darkness? Nothing in the record, just case law, Your Honor. Walker v. Woodford, which is the district court in Southern California with its 30-60 watt lights, 24 hours a day. District court in Western District of Washington in Bison is the case. Constant illumination, 24 hours a day. How many watts? I believe it was 30, but I'm not sure, Your Honor. But it's constant illumination all day. I mean, this just seems to me, how am I supposed to make a decision on this record where all I have is this sort of difficult and conclusory affidavit? I'm not sure it's conclusory, Your Honor. It's based on the experience of the person talking, that darkness, that there's problems in there, and the problems are exacerbated by darkness. The problems are exacerbated by even dim light, but there's dim light to allow sleeping. And I should note for the Court that not any reported decision, but the district court has looked at this in Arizona a number of times. And this Court, in an unreported decision, affirmed these very questions out there that on an exact similar record, the exact similar arguments, and rejected every one of them and affirmed them. We don't have those records. The unfortunate thing in this case is that the plaintiff, the prisoner, was floundering around as his own counsel in the district court. Now he's got very able and competent counsel, but they got here too late. It's a little bit like Gideon v. Wainwright. Abe Fortas showed up, and the case took a different turn. But in this case, the prisoner was on his own in the district court. He didn't present a factual question in some of these areas. I looked in vain for a possible question of fact on the lighting situation. All we have is his ipsy dixit that he couldn't sleep and he was losing weight. And it was a very unpleasant place to be. But he was in segregation, and segregation is unpleasant too. I agree, Your Honor. And of course, Judge Goodwin, he's held to the same standards as anybody else. But I would note in this Court's decision in Kenan, the prisoner was unrepresented. But he made a much different and better factual basis for what was going on, for example, with the light, that he was having these severe sleep problems, that he had psychological problems, and at least implicitly from the decision, it looks like he went into much greater detail. Here, he didn't go into any detail. I mean, he didn't go into any detail at all. And plus, when he was complaining about it, he was complaining about the 24-hour light while the argument is shifted to this difference because counsel's arguments in their briefs are not the 24-hour light being a problem, but the length of time the light is dim. And there's certainly no evidence or even logical conclusion to be made that 6 hours of dim light is any worse or better or different than 8 hours of dim light. There's no indication that it was the dimness of the light that was causing him sleep problem, and that's certainly something somebody unrepresented could have put into the record without any kind of sophistication. Yeah. Okay. I think my time's up, Your Honor. You're welcome to answer any other questions. Okay. I think at this time, no, thank you. Thank you. Now, before you get into your response, let me ask you a question that you may not at this time be prepared to answer. I take Judge Goodwin's point, that is to say, at this point, he has highly competent counsel. In trial court, he represented himself. And by the standards of pro se representation, he didn't do a terrible job, but, you know, I don't know. Is your firm likely to represent him if this gets sent back? Yes, we would absolutely try to represent Mr. Hernandez. Absolutely try? Yeah. I hear the word try. Because what happens with our firm is that we have to go through an approval process for each stage of representation. And so representation initially was approved by our pro bono panel for the appeal. But typically in these cases, we're allowed to continue representation. Right. And I don't expect you to give an authoritative answer here. I'm not sure it makes much difference, really, to us. But it does occur to me that something different may happen, depending on whether he's represented or not, if we do remand. Okay. Correct. The point is duly noted. I would just like to make three points on rebuttal. The first is that with respect to the step-down process, it's true. What we're relying on here is a discovery, an interrogatory response that this process is pending review and that it's taken away sometimes and it's available at some times. And that really is the point here, that the step-down process is not always available to Mr. Hernandez. And therefore, it's not really a viable option. It doesn't answer the question as to the frequency of review. The second is with respect to the debriefing process, which is outlined on page 267 of the excerpts of record. As we've pointed out, this process ultimately does not result in Mr. Hernandez being placed back into the general population because he is still in danger. And finally, with respect to the lighting claim, I take Judge Goodwin, your points about the record being sort of the way that the record was developed here. But ultimately, I think the point really is that there is absolutely no justification in this record from the ADOC as to why there's such an inconsistent lighting policy, meaning that on some days of the week, he's allowed to have six hours of light versus four hours of darkness. And that, I think, is sufficient for this Court to reverse the district court's grant of summary judgment on that claim as well. Okay. Thank you very much. Thank you both sides. Thank you. The case of Hernandez v. Estrella now submitted for decision.
judges: Mills, Goodwin, Fletcher W.